MILLER, State Auditor, *v.* STATE *ex rel.* RUSSELL, Dist. Atty.

[94 South. 706, In Banc, No. 23220.]

1. SCHOOLS AND SCHOOL DISTRICTS. *Constitution held to command legislature to provide funds for exclusive purpose of common school term of not less than four months, distributed on a per capita basis of educable children.*

Section 206 of the Constitution of 1890, viewed in the light of sections 201 and 205, may be reasonably construed to mean that the legislature was commanded to provide for a common school term of not less than four months, and funds for that exclusive purpose must be distributed on a *per capita* basis of educable children, as supported by section, 1, chapter 21, Laws 1922.

2. CONSTITUTIONAL LAW. *Of two reasonable constructions of Constitution duty of court to adopt the one which upholds statute.*

Where there are two reasonable constructions of a constitutional provision, one upholding a statute, the other invalidating it, it is the duty of the court to adopt that construction which upholds the statute.

3. CONSTITUTIONAL LAW. *Schools and school districts. Court will not declare statute unconstitutional unless it appears so beyond reasonable doubt; law providing for appropriation for maintenance and support of public schools of the state held not unconstitutional.*

   The court will not declare a statute unconstitutional unless it appears beyond a reasonable doubt that it is in conflict with the Constitution, and section 2, chapter 21, Laws 1922, does not so appear as contravening section 206 of the Constitution.

4. SCHOOLS AND SCHOOL DISTRICTS. *Constitutional provision providing for county common school fund held not to prohibit appropriation of additional funds for equalizing public school terms beyond four-month term.*

   Section 206 of Constitution 1890 does not prohibit the legislature from appropriating additional funds for equalizing public school terms beyond the four-month term.

5. STATUTES. *Law equalizing state aid in all county and school districts held not unconstitutional as special law.*

   Section 90 of the Constitution of 1890 is not violated by section 2, chapter 21, Laws 1922, because it is a general law applicable to any or all counties and school districts, to be equalized by state aid.

6. SCHOOLS AND SCHOOL DISTRICTS. *Public policy of state to permit and encourage free public schools.*

   It is the public policy of the state to promote and encourage free public schools by all suitable means and measures, as commended by section 201 of the Constitution, and expressed by the legislature and the people.

7. CONSTITUTIONAL LAW. *Inhibition of state's power to enact unlimited legislation must appear plain before implied.*

   Constitutional restriction by implication of the state's sovereign power to enact unlimited legislation for the public good is not favored, and the inhibition must appear plain and certain before it will be implied by the courts.

   SMITH, C. J., and ANDERSON, J., dissenting.

APPEAL from circuit court of Hinds county.

HON. W. H. POTTER, Judge.

Mandamus by the state, on the relation of R. C. Russell, district attorney, for Mt. Olive separate school district, against W. J. Miller, state auditor. From a judgment awarding the writ, and ordering defendant to issue a warrant to plaintiff representing the share of the school district in the semi-annual distribution of the equalization

fund provided in Laws 1922, chapter 21, section 2, defendant appeals. Affirmed.

*H. Cassedy Holden,* assistant attorney-general, for the state.

*The legislature is without power to appropriate for more than the four-month term.*

Since this court has held that the initiative and referendum amendment was never legally adopted and inserted in the Constitution of this state, then it necessarily follows that the pretended amendment to section 206 of the Constitution was never legally adopted and inserted in the Constitution. But the court below held that this pretended amendment to section 206 was not necessary; that the legislature had the power to enact section 2, chapter 21, Laws of 1922, under section 206 of the Constitution in its old or unamended form.. The court held that section 206, as it read prior to the attempted amendment, only dealt with the state common school fund as applied to the four-month school term required in section 205, and that the legislature was not prohibited by section 206 from appropriating an additional sum for additional school terms to be distributed otherwise than on a *per capita* basis.

It is obvious from a reading of sections 201, 205, and 206, that it is the intent of the Constitution to limit the legislature in appropriating the funds of the state for the support and maintenance of the public schools. Reading the three sections together it is clear that the Constitution makers were careful to restrict state aid to public schools by confining appropriations to a four-month school term or period.

Had the makers of the Constitution stopped when they had written section 201, then the power of the legislature to appropriate for the support of the public schools would have been unlimited and restricted. Section 201 is in general terms. It imposes upon the legislature the broad and general duty "to encourage, by all suitable means, the pro-

motion of intellectual, scientific, moral, and agricultural improvements by establishing a uniform system of free public schools, by taxation or otherwise," etc.   There is nothing in this section that could limit the legislature as to the extent and manner of appropriating and distributing funds in support of the public schools.

But the Constitution makers did not stop with section 201.   They went further and enacted section 205, which is mandatory in requiring that a public school shall be maintained in each school district in the county at least four months during the scholastic year, and a penalty is provided for school districts neglecting to comply with this mandate.   This section clearly shows that it was intended to make certain that there would be four months of schooling for children or educable age in every school district in the state.   In this section the idea of the four months' school is first set forth.   Here we have the first unfoldment of the purpose and plan of the Constitution makers, namely, to insure four months of school to the children of this state.

Nor did the Constitution makers stop with section 205. They were not content with empowering the legislature to establish and support a uniform system of free public schools for children between the ages of five and twenty-one years.   They were not willing that this broad and comprehensive authority should be given unrestricted to the legislature.   They feared that the legislature might not appropriate sufficient money to support the public schools of the state for a reasonable period each year.   They were apprehensive lest some parsimonious legislature might appropriate only enough money to run the schools for one month or a few days; or lest some extravagant legislature might appropriate vast and prodigal sums for the support of the schools for the entire year and thus threaten the state treasury with bankruptcy or fasten upon the state an obligation too onerous and ponderous to carry.   So they required that a public school should be maintained in each school district at least four months and they further re-

quired, in section 201, that the legislature appropriate a state common-school fund out of the general fund which, together with the county common-school fund would be sufficient to maintain the county schools for the four-month term required by section 205.

All constitutional provisions are presumed to be mandatory unless clearly otherwise. Section 201 is mandatory. Section 205 is mandatory. Section 206 is just as mandatory as section 207, which requires that separate schools "shall be maintained for children of the white and colored races."

Section 206 provides: "There shall be a county common-school fund, which shall consist of the poll tax, and a state common-school fund which, together, shall be sufficient to maintain the common schools for the term of four months in each scholastic year."

The section does not say "at least four months in each scholastic year." It says "which together shall be sufficient to maintain the common schools for the term of four months in each scholastic year." The section does not proceed further and say that the legislature may provide for additional school terms. It does not authorize the legislature to add anything more. It only authorizes that body to appropriate from the general fund, a state common-school fund to be applied for the four-month school term.

But the makers of the Constitution did not arbitrarily require that there should only be four months of schooling. In section 205 it is provided that the public common schools must be maintained "at least four months," showing that it was contemplated that some schools might be kept open longer than four months; and so, in section 205 it is provided that if it is desired to run the schools more than four months in any county or separate school district, then such county or separate school district, not the legislature, may provide for such additional terms by a special tax levy.

The granting of the power to the counties and separate school districts to provide for additional school terms means that the power of the legislature to provide for ad-

ditional school terms is denied by necessary implication. It is an established rule of construction that where a Constitution confers a power or enjoins a duty, it also confers by implication all powers that are necessary for the exercise of one or for the performance of the other.

In like manner the legislature may be restrained from the exercise of power, as well by implication from the nature of the statute as by express prohibition. Every positive direction in the Constitution contains an implication against anything contrary to it, or which would destroy or disappoint the purpose of that provision. *Cain* v. *Smith*, (Ga.), 44 S. E. 5; *State* v. *Patterson* (Ind.), 105 N. E. 228; *Collins* v. *Henderson* (Ky.), 11 Bush. 74; *State* v. *Railroad* (Mo.), 162 S. W. 144; *Hooper* v. *Britt* (N. Y.), 96 N. E. 371; *Page* v. *Allen* (Pa.), 98 Am. Dec. 272; *Burton* v. *Dupree* (Tex.), 46 S. W. 272; *State* v. *Thompson* (Wis.), 137 N. W. 20; *Henry* v. *State*, 87 Miss. —; *Lumber Co.* v. *State*, 97 Miss. 355; *Beck* v. *Allen*, 58 Miss. 143; *Chrisman* v. *Brookhaven*, 70 Miss. 277; *Ellis* v. *Greaves*, 82 Miss. 36; *Hewes* v. *Langford* (Miss.), 62 So. 358; *City of Jackson* v. *Hinds County* (Miss.), 61 So. 175; *Underwood* v. *Wood* (Ky.), 15 L. R. A. 825; *Shanklin* v. *Boyd*, 146 Ky. 460, 38 L. R. A. (N. S.) 710.

The general rule is that where the means for the exercise of a granted power are given by the Constitution, no other or different means or powers can be implied, either on account of convenience or of being more effectual. And where the manner of exercising a given power is prescribed, the method thus designated is exclusive. *Field* v. *People*, 3 Ill. 79; *Fletcher* v. *Oliver*, 25 Ark. 289; *State* v. *Barnes* (Fla.), 3 So. 433; *State* v. *Patterson* (Ind.), 105 N. E. 228; *State* v. *Stark County*, (N. D.), 103 N. W. 913; *Parkes* v. *West* (Tex.), 111 S. W. 726.

If section 206 does not contain a limitation upon the legislative power in the matter of supporting the public or common schools, then why was it embodied in the constitution?

So that, it is submitted that the legislature had no power to enact section 2, chapter 21, Laws of 1922, because by that section it appropriated funds of the state to be used in extending the public or common-school terms beyond the four-month period.

*Wells, Stevens & Jones,* for appellee.

The appropriation of the Mississippi legislature under section 2, chapter 21 of the Laws of 1922, is a valid appropriation which was within the power of the legislature to make, regardless of the constitutionality of the initiative and referendum amendment, and amendments adopted thereunder.

This appeal presents sharply for the decision of the court the constitutionality of chapter 21, Laws of 1922. It also presents the question of the validity of the appropriation provided by section 2 of chapter 21 of Laws of 1922, notwithstanding the recent action of this court in overruling the *Brantley case.* Thus, the first portion of our brief, will present the primary fundamental proposition whether section 2 aforesaid, is violative of section 205 of our Constitution. This is the question upon which the decisions of the trial court turned and this is the question discussed by the learned circuit judge in the court below. We refer to and invite the careful reading of Judge POTTER's decision, made a part of the record, and in addition thereto present the following views and authorities:

The public policy and the Constitution of Mississippi imposes the imperative duty upon the state to educate the youth of our land. Article 3 of the Ordinance of Congress, for the government of the Northwest territory. Constitution of the state of Mississippi, adopted in 1832, article 7, section 14; Constitution of 1869, article 8, section 1.

The supreme court of Mississippi has recognized the cardinal rule of construction and has frequently considered the presumption which safeguards any legislative act until the contrary appears beyond a reasonable doubt. *Runnels* v. *State,* Walker's Reports, 146; *State* v. *Henry,* 87 Miss.

125, at 143; *Hart* v. *State,* 87 Miss. 171, at 176; *Dantzler-Lumber Co.* v. *State,* 97 Miss. 355; *Natchez & Southern R. R.* v. *Crawford,* 99 Miss. 697; *State* v. *Wheatly,* 113 Miss. 555, 74 So. 427; *Richards* v. *City Lumber Co.,* 101 Miss. 678, 57 So. 977; *University of Miss.* v. *Waugh,* 105 Miss. 623, 62 So. 827, L. R. A. 1915D, 588n., Ann. Cas. 1916E 522; *State* v. *Jones,* 64 So. 469; *Darnell* v. *Johnson,* 109 Miss. 570, 68 So. 780; *Postal Tel. & Cable Co.* v. *Robertson,* 116 Miss. 204, 76 So. 560; *Fletcher* v. *Peck,* 6 Cranch 87, (L. Ed.) 162.

It will be observed that section 201 contains no prohibition upon the legislative power but on the contrary, imposes the high and positive duty of encouraging by all suitable means the promotion of education. This section is all embracing. Every phrase in it is a phrase of inclusion rather than of exclusion of promotion rather than of prohibition.

An examination of section 205 will reflect the positive duty imposed on the legislature to maintain in each school district in the county at least a four-month term during each scholastic year. The purpose of this section is to provide an irreducible minimum. It does not provide a maximum of aid by way of appropriation or maximum school term. The spirit of section 205 made a four-month term of school compulsory, regardless of any statute providing for compulsory education. Unless there is some word in the Constitution that prohibits and condemns this method, then certain it is the legislature is supreme. It is needless for us to remind the court of the language of the great judge in *Martin* v. *Waddell,* 16 Peters, 410.

Eliminating any question of a four-month term and the case of *Board of Education* v. *Pridgen,* 106 Miss. 219, hereinafter discussed, there is no self-imposed limitation on the general power of our state legislature to appropriate money in aid of public education.

### The Pridgen Case.

We have read and reread the opinion in the Pridgen case and with respect to this court and the learned judge who

wrote the opinion, we experience some difficulty in saying just what the court did decide. Section 90 of the Constitution was one of the battle grounds of that case. The opinion seems to turn sharply upon the construction of section 90. If the court in the Pridgen case assumes to hold that section 90 prohibits the act here and now under review, then the decision is manifestly wrong and should be overruled. Certainly there can be no contention that chapter 21, laws of 1922, is a local, private or special law. It operates statewide and the fund is applied under the supervision of a state board, in a way to equalize rather than discriminate. No special county or special school district is mentioned in the statute making the appropriations. The law is a general law. Its administration is in a constitutional board.

It would seem that the Pridgen case necessarily decided that the appropriation made by the legislature of 1912 should be condemned primarily because it was in aid of counties "whose common schools cannot run for the constitutional period of four months" and being in aid of the minimum term provided by the constitution, section 206 requires such fund to be distributed in proportion to the number of educable children. The Act of 1912 and the act now under review are quite different. The act of 1912 deals with the four-month term and is in aid of those schools which did not have sufficient funds to operate four months. In the case at bar, according to the allegations of the petition admitted by the demurrer, the equalizing fund is for the purpose of prolonging school terms a respectable length of time and to equalize teachers' salaries and in a general way equalize the free schools of the state operating under varied and varying circumstances and conditions of life. It was not the purpose of section 2, chapter 21, Laws of 1922, to help the little schools of our state to put over the four-month term. That was being done already. The primary object of this fund was to recognize the ever increasing demands of an up-to-date school system and enable school terms to run six and seven months in each

scholastic year and make the whole system uniform in the various counties in our state. The Prigden case dealt with that particular common-school fund which, together with the county fund, "shall be sufficient to maintain the common school for the term of four months in each scholastic year." It was denominated a common-school fund but after all, it was nothing but a definite, particular kind of an appropriation out of the state treasury. That particular appropriation required by section 206 must be distributed according to the number of educable children.

The construction for which we contend is further supported by certain provisions of section 208, which speaks of "other educational funds," and "any funds." This section in prohibiting the control of schools by a religious or other sect, shows that "other educational funds" were contemplated. The equalizing fund here under attack can well be called "other educational funds" or "other funds" and there is no prohibition upon the method of its distribution.

We have under review chapter 21, Laws of 1922. The very next chapter, to-wit: Chapter 22, Laws of 1922, appropriates three hundred fifty thousand dollars for the aid of the agricultural high schools for the scholastic year, 1921-22, and the same amount for 1922-23. An agricultural high school is a free public school filled with pupils from all over the county. The appropriation is not disbursed in proportion to the number of educable children in the county in which the school is located.

Likewise, chapter 23, Laws of 1922, appropriates money for the support of Summer normals, while chapter 24, votes an appropriation for the support of vocational training in Mississippi, and chapter 25, for the support of vocational rehabilitation of disabled persons in Mississippi. Chapter 26 appropriates ten thousand dollars for the work of sanitation, hygiene, industrial work, and supervision of negro rural schools. Chapter 27 appropriates money for the extension work under the Smith Lever Act of Congress. All these statutes, or practically all of them, are in aid of the free school system of Mississippi and the appro-

priations are voted under the inherent power of the legislature. They are not only beneficent and wise, but necessary.

We have submitted to the court the first and the most important question in the case. If the court approves the conclusions reached by the learned circuit judge, then the decision in the Robertson case in nowise affects the appropriation and the legislature hereafter is free to renew the appropriation as its wisdom may dictate.

*Fred H. Lotterhos,* for appellees.

The Constitution of Mississippi is one of limitations and all legislative power is in the legislature except as limited by the fundamental law, as appears from section 33 of the Constitution. *Hinton* v. *Perry County,* 84 Miss, 536; *State* v. *Edwards,* 93 Miss. 704.

Where there is a well-founded reasonable doubt of the constitutionality of a legislative act, such act must be sustained, the state legislature is unrestricted, save by state or federal Constitution; and a statute passed by it, in the exercise of its power, the language of which is plain, must be enforced. The constitutionality of the statute is *prima-facie* presumed and all doubts are resolved in its favor and where it is susceptible of two interpretations the courts must uphold the act. *Natchez R. R. Co.* v. *Crawford,* 99 Miss. 697; *Hart* v. *State,* 87 Miss. 171; *State* v. *Wheatley,* 112 Miss. 555.

From the foregoing it seems plain that the legislature would have ample power to make all manner of appropriations for schools, if the Constitution were silent as to the provisions to be made for public schools. However, although the makers of the Constitution had by section 33 given the legislature abundant authority to provide for public schools, they took the pains to give specific instructions by section 201, requiring the legislature to establish a uniform system of free public schools by taxation or otherwise.

Section 201, embodies the central and dominant idea for the establishment and conduct of the free public schools. This section was not necessary to give power to the legislature, but obviously was intended to make sure that a public school system should be set up and that it should be uniform and free.   Thus far it was made certain that we should have a system of free public schools, but without certainty as to the minimum duration of the term.   Hence, the Constitutional Convention, notwithstanding it had given the legislature the power in section 33, to support schools, and in section 201 had commanded it to establish a uniform system of free public schools, was not satisfied until it had established a minimum term to be supported by an appropriation from the state treasury and the dedication by the state of the poll taxes.

It was said in effect: "You may have schools; you must have schools and they must be supported for not less than four months by a direct appropriation and by the dedication of the poll taxes."   By this construction the three provisions are effective.   The last is collateral to the second and the second is collateral to the first; all harmonize and none is a limitation on the other.

Should we reason from the other direction; that is to say that sections 205 and 206 provide the only manner of distribution and the limits in which the state will support free public schools, it becomes manifest that the provision in section 201 that the legislature shall establish "a uniform system of free public schools by taxation or otherwise, "was only not necessary but was futile, as well, because 206 and 207 had provided the only means, the limits of the term and the only manner of distribution.   The writers of the fundamental law were too careful in the choice of words, and, as is known to all, were too learned in the law and the nature and structure of Constitutions to be justly subject to the casual implication that they included unnecessary and conflicting provisions for the same subject-matter.   It is not without value to observe that section 201 was written as the first section in the chapter on education

and that the sections following, including 205 and 206, are subordinate to it and were intended to make sure that in certain respects it would be made effective leaving it with the legislature to elaborate, from time to time, in such manner as to effectuate the general command to establish a uniform system of free public schools. If sections 202 to 213, inclusive, present an exclusive definition of and complete plan for "a uniform system of free public schools," the clause in section 201 commanding the establishment of such a system is meaningless and mere waste of words.

When the legislature was commanded to establish a uniform system of free public schools and thus carry into execution powers granted by the Constitution, it carried the implication that it might employ such means as in its judgment might be most advantageous. Where such means are really calculated to effect the object intended, courts cannot inquire into the degree of their necessity. *McColloch* v. *Maryland,* 4 Law Ed. 579.

If the distribution be limited to the method set forth in section 206, whether the appropriation be for the four months or for an additional term, it will be impossible for the legislature to maintain a uniform system. This court has said that it has judicial knowledge of how public schools operate. *Ladder* v. *Talbert,* 83 So. 748.

Hence it knows that it is impossible to maintain free public schools according to the standard required by modern practice and desired by the legislature and people of Mississippi, if all distribution be according to section 206. Which does the Constitution intend? What the distribution, whether for four months or more, shall be on the educable child *per capita* basis, even though it prevent uniformity in the system, or that the four months term shall be provided for on this basis and that the legislature shall devise such other means as shall maintain "A uniform system of free public schools?" There can be no doubt of the wishes of the people speaking through the last two legislative sessions, where they spoke in no unmistakable

terms, although there was not constitutional command to create an additional fund to extend the terms of free schools, and it is submitted that the Constitution intended to make such flexibility to changing conditions possible.

We conceive that we have scientific rules by which to interpret the Constitution. It would seem that if one apply those rules without any impression of where they will lead, he will be drawn to the above stated conclusion and its correctness will be manifest.

The court has not passed upon the merits of the proposition hereinbefore set forth and is under no binding authority determining the question. It has been suggested that possibly the decision in the case of *State Board of Education* v. *Pridgen,* 106 Miss. 219, controls herein. In that cause it was shown that the legislature of 1912, made an appropriation, to be distributed by the state board of education to schools unable, otherwise, to maintain the constitutional four-month term of public school. (Laws 1912, ch. 5, secs. 1 and 2.)

It was contended that the act violated sections 90, 205 and 206, of the Constitution and this court held, speaking all the while of an appropriation to augment the common-school fund required for the maintenance of the four-month term, that the act there before the court violated section 90, in that it was a special law, providing for the support of a class of common schools in certain localities of the state and violated section 205 in that it regarded districts which were delinquent under section 205. It is respectfully submitted that this is all that was decided. It should be kept in mind in considering the reasoning of the court respecting sections 205 and 206, that the court was dealing with and speaking of the distribution of funds for the purpose of carrying out the requirements of a four-month term.

The act of 1922 does not attempt to change the constitutional method of dividing the funds for the four-month term, but makes special appropriation for these funds to be divided in the constitutional method. It is not a special

law, providing for the support of a class of common schools in certain localities of the state, and does not reward districts which are delinquent under section 205. Therefore, the Pridgen case is not authority here; indeed, it sheds no light on this question.

Never, before, was this court asked to pass upon an act which complied in all respects with the constitutional directions for the four-month term and made additional provision for making an additional term uniform. The Act of 1922 is in every respect a general law, it designates no locality, no particular school, and no class. Its beneficiaries may be found in any or all parts of the state. No member of the legislature voting for the bill could know the schools to which the distribution would be made. Three constitutional officers make the apportionment, not according to locality, particular school or class, but to those showing a state of facts falling within the terms of the general directions given by the legislature to the state board of education.

It might be said that in effect this would be a special or local provision because the state board of education might show favoritism and be governed by localities or special classes rather than by the determination in facts, as directed by the legislature.

If such apprehension as this should control in matters of this kind, government would fail, largely, in some of its most beneficent activities. Administration and application of legislative purposes must be entrusted to someone. Why not to these constitutional officers elected by the people. In this connection such fear would be unwarranted, because the appropriation is not a continuing one. It is made for two years only and the apportionment made under it must be reported to the legislature, which in making the next appropriation may add additional details controlling the facts to be found as the basis for the apportionment. Localization and partiality are not possible where the officers making the apportionment are to be governed by the facts found and not by the whim of the

officer.   We may safely infer that the legislature will always give directions to serve the purpose of section 201 of the Constitution by making the school system uniform and to prevent localization in conflict with section 90.

It is interesting to note what the court has said about the sections of the fundamental law in other cases.   *Turner* v. *Hattiesburg,* 53 So. 681, 98 Miss. 337 ; *Burkin* v. *Mitchell,* 106 Miss. 253, 63 So. 458.

HOLDEN, J., delivered the opinion of the court.

This is an appeal from a judgment awarding a writ of mandamus directed to the appellant, state auditor, and ordering him to issue a warrant for the sum of four hundred forty-five dollars and sixty-one cents to the appellee, Mt. Olive separate school district of Covington county, representing the share of said school district in the semiannual distribution of the equalization school fund provided for in section 2, chapter 21, Laws 1922.   There is also before us a companion case (No. 23221) 94 So. 716, involving the same question, and which will be determined by the decision of the case at bar.

The suit is for the purpose of determining whether or not the auditor is legally authorized to issue warrants in the distribution of the additional equalization school fund provided for in section 2, chapter 21, Laws 1922; it being the contention of the assistant attorney-general, representing the auditor, that said section 2 is void because, first, it is in conflict with section 206 of the Constitution, and, second, that it is invalid because it contravenes section 90 of the Constitution.   Chapter 21, Laws 1922, is as follows:

"Section 1.   That the sum of two million one hundred fourteen thousand five hundred thirty-five dollars ($2,114,-535) be, and the same is hereby appropriated out of any money in the state treasury not otherwise appropriated, for the support and maintenance of the public schools of the state of Mississippi for each of the calendar years 1922 and 1923.

"Sec. 2. That the additional sum of one million two hundred sixty-eight thousand seven hundred and twenty-one dollars ($1,268,721) be, and the same is hereby appropriated out of any money in the state treasury not otherwise appropriated, for the support and maintenance of the public schools of the state of Mississippi for each of the calendar years of 1922 and 1923, which sum shall be disbursed by the state board of education, consisting of the state superintendent of education, secretary of state, and the attorney-general, in such a manner as to equalize public school terms as nearly as possible throughout the state in accordance with the following conditions:

"(a) In equalizing school terms, teachers' salaries shall also be equalized, grade of license held, competency of the teacher and living conditions being taken into consideration.

"(b) County and district school levies shall not be counted against any county or district in the disbursing of this fund.

"(c) The state board of education shall apportion the fund provided for in this act semiannually to the several counties and separate school districts, the auditor being furnished with a certified copy of the apportionment to be used by him in making out the warrants on this fund in favor of the county treasurers and treasurers of separate school districts. Certified copies of the apportionment shall also be sent by the state superintendent to the state treasurer, the superintendent of public education of each county, each county treasurer and the treasurer of each separate school district.

"(d) The manner in which this fund has been disbursed shall be included in the biennial report of the state superintendent of education to the legislature.

"Sec. 3. That this act take effect and be in force from and after its passage."

The opposing contention of the appellees is that the mandamus should issue: First, because said section 2 is valid as an exercise of the legislative power, and does not contra-

vene sections 206 and 90 of the Constitution; and, second, that to deny the relief would be to impair the obligation of contracts between the state, through its school authorities, with the school districts and employed teachers, as to the distribution of the school fund provided in section 2 of the act.

Some light may be thrown upon the questions involved by giving a brief history of the situation. In 1919, section 206 of the Constitution was amended under the initiative and referendum amendment to the Constitution, which at that time this court had declared valid and a part of the Constitution. This amendment to section 206 provided as follows: .

"But the legislature shall have power to make an additional appropriation to be disbursed by the state board of education in such manner as to equalize public school terms throughout the state."

The amendment to section 206 became a part of the Constitution in 1920. Thus after section 206 was amended chapter 21, Laws 1922, was enacted by the legislature.

Recently this court, in the case of *Jos. W. Power, Secretary of State, v. Robertson*, 93 So. 769, decided that the initiative and referendum amendment to the Constitution was null and void, and overruled the *Howie* v. *Brantley Case*, 113 Miss. 786, 74 So. 662, Ann. Cas. 1917E, 723. It will be observed, therefore, that the amendment to section 206 of the Constitution adopted in 1919 was void because the initiative and referendum law under which it was submitted was void. So we are to now consider section 206 in its original form, before it was attempted to be amended.

The main and decisive question in the case before us is whether or not section 2 of chapter 21, Laws of 1922, shall stand or be struck down as violative of either section 206 or section 90 of the Constitution. A consideration of the inquiry brings into review for construction sections 201, 205, 206, and 90 of the Constitution, which sections we here set out in the order named:

"Section 201. It shall be the duty of the legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years, and, as soon as practicable, to establish schools of higher grade."

"Section 205. A public school shall be maintained in each school district in the county at least four months during each scholastic year. A school district neglecting to maintain its school four months, shall be entitled to only such part of the free school fund as may be required to pay the teacher for the time actually taught.

"Section 206. There shall be a county common school fund, which shall consist of the poll tax, to be retained in the counties where the same is collected, and a state common school fund, to be taken from the general fund in the state treasury, which together shall be sufficient to maintain the common schools for the term of four months in each scholastic year. But any county or separate school district may levy an additional tax to maintain its schools for a longer time than the term of four months. The state common school fund shall be distributed among the several counties and separate school districts in proportion to the nmber of educable children in each, to be determined from *data* collected through the office of the state superintendent of education in the manner to be prescribed by law."

"Section 90. The legislature shall not pass local, private, or special laws in any of the following enumerated cases, but such matters shall be provided for only by general laws, viz.: . . .

"(p) Providing for the management or support of any private or common school, incorporating the same, or granting such school any privileges."

We think it proper to consider together the first three sections of the Constitution, as they deal with the subject-matter involved. It will be observed that section 201 makes it the duty of the legislature to encourage and promote

education by a uniform system of free public schools; that it must promote and encourage public schools by all suitable means, and by taxation and otherwise, as soon as practicable.  Section 205 commands that a public school shall be maintained in each school district in the county "at least four months" during each scholastic year.  Section 206 then provides there shall be a common school fund, consisting of the poll tax, to be retained in the counties where collected, and a state common school fund, to be taken from the general fund in the state treasury, which together shall be sufficient to maintain the common schools for the term of four months in each scholastic year.  But any county may maintain its schools for a longer term by an additional tax in the county.  It then provides that the state common school fund shall be distributed among the several counties and school districts in proportion to the number of educable children therein; that is, that this fund shall be distributed on a *per capita* basis.

It is the contention of the appellant that section 2 of chapter 21, Laws 1922, is void because section 206 of the Constitution furnished a complete and exclusive scheme and provision for maintaining the public schools by state aid; that by implication the legislature is prohibited from extending any further state aid than to maintain the schools for four months as provided in the section; and that moreover the said section 2 is void because it does not provide a distribution of the fund on a *per capita* basis.  The *Pridgen case,* 106 Miss. 219, 63 So. 416, is cited and relied upon to support these views.

We confess this interpretation of the Constitution is not without merit, and may be said to be a reasonable construction; but we think there is another and different construction, which expresses the true intent, that is equally as reasonable as the one contended for by the appellant, and is the better view.

It is our opinion that, when section 206 is viewed in the light reflected from sections 201 and 205, it may be reasonably construed to mean that the legislature was com-

manded to provide for a common school term of "not less than four months," and that sufficient funds be appropriated out of the state treasury to maintain such school for the period of four months, and that the public funds appropriated for that purpose must be distributed in proportion to the number of educable children, or upon a *per capita* basis, and not otherwise. We think it was in the minds of the Constitution makers that the state should provide for at least four months of public schooling in each year. This provision should be carried out in the manner prescribed in section 206, and as supported by the appropriation in section 1, chapter 21, Laws 1922.

We find section 201 plainly making it the duty of the legislature to promote public education in the state by all suitable means, by taxation and otherwise, by establishing a uniform system of free public schools, and that they should do this as soon as practicable. Not content with this command to the legislature, the framers of the Constitution went farther, and clearly enjoined upon the legislature, in section 205, that public schools must be maintained in each school district at least four months during each scholastic year. When they said "at least four months" we understand they meant that four months was to be the minimum term; or, to put it in another way, there must be not less than four months of schooling, and, inferentially, there may be a longer term, or at least a longer term was not intended to be prohibited, either expressly or by implication.

We cannot bring ourselves in accord with the view that the makers of the organic law intended to circumscribe or restrict state aid for public school education in this state, for all time to come, to only four months in the year. It clearly appears to us their purpose under section 206 was to provide for "at least four months" of public schooling, inclusively, not exclusively, without inhibition as to any longer term.

We think it is a reasonable view to interpret that part of section 206 which provides for a *per capita* distribution

as meaning that the distribution on this basis should be made with reference solely to the funds provided for the four months term named in the section. It was not intended that the *per capita* distribution should apply to any school funds outside of the funds necessary to carry on the schools for the four months.

This construction of section 206 is reasonable, and, while the opposite construction put upon it by the appellant may also be reasonable, yet it is our plain duty to adopt the construction upholding the statute where there are two reasonable constructions, one of which upholds the statute and the other invalidates it. Furthermore, we should follow the rule that this court will not declare a legislative act void unless it appears to us beyond a reasonable doubt that it conflicts with the Constitution. We do not think beyond a reasonable doubt that section 2 of chapter 21, Laws 1922, contravenes the Constitution. *State* v. *Henry,* 87 Miss. 125, 40 So. 152, 5 L. R. A. (N. S.) 340; *Hart* v. *State,* 87 Miss. 171, 39 So. 523, 112 Am. St. Rep. 437; *Dantzler* v. *State,* 97 Miss. 355, 53 So. 1; *Natchez* v. *Crawford,* 99 Miss. 697, 55 So. 596; *State* v. *Wheatley,* 113 Miss. 555, 74 So. 427; *Richards* v. *City Lumber Co.,* 101 Miss. 678, 57 So. 977; *University of Miss.* v. *Waugh,* 105 Miss. 623, 62 So. 827, L. R. A. 1915D, 588 n., Ann., Cas. 1916E, 522; *State* v. *Jones* (Miss.), 64 So. 469; *Darnell* v. *Johnson,* 109 Miss. 570, 68 So. 780; *Postal Tel. & Cable Co.* v. *Robertson,* 116 Miss. 204, 76 So. 560; *Fletcher* v. *Peck,* 6 Cranch, 87, 3 L. Ed. 162.

The *Pridgen Case, supra,* is cited and urged as decisive of this case, but we disagree with counsel in this contention, for the reason that the Pridgen case was not dealing with a fund such as is provided in section 2 of chapter 21, Laws 1922. In that case the court had before it the question of whether a supplemental fund of five thousand dollars could be distributed to supply certain deficiencies in the school term of four months as provided by section 206 of the Constitution, and the court there had in mind only the question of *per capita* distribution of the supplemental

fund in carrying out the four-month term. The decision in that case is sound as to *per capita* distribution because it was dealing with the four-month term prescribed by section 206, and the funds to be used to maintain that four-month term could be distributed only upon a *per capita* basis, and when the school authorities attempted to distribute it otherwise under the act it was contrary to the method of distribution provided by the Constitution.

In the Pridgen case the court could have decided only the question that it had before it, namely, the four-month-term funds; any language in the opinion which may seem to have indicated that all other school funds provided by the state should be distributed *per capita* was no more than *dicta,* because such question was not before the court.

There being two reasonable theories of construction of section 206, it is not strange the legislature, and other officials, took the view that it was necessary to amend the section before any appropriation of additional state funds for schooling could be made beyond the four-month term provided for by section 206. This plausible construction was thought by many to have been indicated by the language of the opinion in the Pridgen case, though the court there was only dealing with a supplemental appropriation for the four-month term. Judicial *dicta* often leads to erroneous conclusions, even for several generations, until corrected by exposing its nothingness.

The history of public school legislation in our state does not, in our opinion, justify the exclusive, narrow, and unprogressive construction contended by appellant, but the other reasonable construction that section 206 does not limit appropriations to the four-month term is indeed more harmonious with the educational policy and progressive thought of our state as expressed in section 201 of the Constitution and by the people and the Legislature.

Section 1 of chapter 21 of the Act of 1922 provides funds for the four-month term prescribed by section 206, and must be distributed according to its requirement.

Section 2 of the act provides a different and distinct fund to be used, not for the four-month period of section 206, but for an independent schooling purpose beyond the mandatory four-month period of section 206; and therefore it need not be distributed on a *per capita* basis, but may be fairly and justly distributed and used for the purpose of promoting education. on a uniform, equal, and equitable basis throughout the state.

Coming now to section 90 of the Constitution, it is our opinion that the funds appropriated under section 2, chapter 21, Laws 1922, here involved, is not an appropriation contrary to said section 90, because the appropriation is a general law, is not class legislation, nor a local or special law, since the funds are to equalize public school terms throughout the state by a fair and equitable distribution, and may be used for any school district in any county, or for all of them, for uniform education, in the judgment of the state board of education, as provided by the act.

In view of the conclusions reached above, it is our judgment that section 206 does not expressly or by implication limit or restrict the legislature to appropriations for the four-month term mentioned in the section of the Constitution, but that the sovereign power of the legislature to provide funds for public education as commanded by section 201 of the Constitution is not limited to a four-month term by section 206, and may be extended within the bounds of legislative discretion.

The view we announce will tend to advance and promote education in our state, while the other view would restrict it contrary to the public policy of the state.

Restriction by implication of the sovereign power to enact legislation for the public good is not favored, and where the inhibition is not clear and certain the inherent power of the sovereign as represented by the legislature may be exercised without limit.

We have not discussed the question of the impairment of obligation of contract as presented by the appellees, be-

cause it is unnecessary to do so, since a decision in their favor is rendered upon another ground.

The judgment of the lower court is affirmed.

SMITH, C. J. (dissenting).

It is always a source of regret to me to be unable to concur in the conclusion reached by a majority of my Associates in the decision of any case, which regret is here more pronounced than usual for the reason that the construction placed by the majority of my Associates on the section of the Constitution here in question confers upon the legislature the unlimited power to support the public schools which I think it should have, but to so concur would cause me to violate what seems to me the plain language of the Constitution, as well as some of the most elementary rules for the construction of written instruments.

The ground on which the majority of my Associates have sustained this appropriation is that section 206 of the Constitution can be reasonably construed so as to either limit or to not limit the power of the legislature to appropriate money for the support of the public schools for that portion of the terms thereof in excess of four months, and since the legislature by making the appropriation has construed the section as placing no limit on its power to so appropriate money, that construction, since it is a reasonable one should not now be departed from.

As I shall hereinafter attempt to demonstrate, the language of the section permits of only one construction, but, if it does permit of another, it is the duty of this court to enforce the one which will more nearly carry out the purpose of the constitutional convention in adopting the sections. *Ratliff* v. *Beale,* 74 Miss. at page 268, 20 So. 869, 34 L. R. A. 472. Of course the construction placed on the Constitution by the legislature in enacting a statute is entitled to great weight, and should prevail unless it is

clearly wrong. The construction which the legislature has placed on section 206, instead of being in accord with the construction which the majority of my Associates now place on it is contrary thereto, for in appropriating money for the support of the public schools it has uniformly acted, save in one instance only, on the theory that its power so to do was measured by that section of the Constitution. The one instance in which this section was violated by the legislature was in what seems to have been clearly a *bona-fide* attempt to comply with the requirement of the Constitution for a four-month school term. Chapter 5, Laws 1912.

Section 33 of the Constitution, by providing that "the legislative authority of the state shall be vested in a legislature," grants to the legislature all legislative power; consequently any other provision in the Constitution dealing with legislative power, in so far as the scope thereof is concerned, is a limitation on and not an enlargement of the power granted by section 33. In fact, the object of state Constitutions, as distinguished from the federal Constitution, "is not to grant legislative power but to confine and restrain it. Without constitutional limitation the power to make laws would be absolute." Quoted from *Sill* v. *Corning*, 15 N. Y. 297, in Cooley's Constitutional Limitations (7th Ed.), 242; 12 C. J. 750; *State* v. *Edwards*, 93 Miss. 708, 46 So. 964; *State* v. *Patterson*, 181 Ind. 660, 105 N. E. 228; *Field* v. *People*, 2 Scam. (3 Ill.) 79; *Commonwealth* v. *International Harvester Co.*, 131 Ky. 551, 115 S. W. 703, 133 Am. St. Rep. 256.

If section 33 of the Constitution stood alone, the power of the legislature to establish and maintain public schools would be unlimited, and this power it could exercise or not as it should deem best, but the makers of the Constitution were not willing to leave the maintenance of the public schools wholly to the discretion of the legislature. By sections 201, 205, and 206 of the Constitution they not only made it mandatory on the legislature to provide a system of public schools, but provided that each school

should be part of a uniform system, should be open for at least four months for the benefit of children between the ages of five and twenty-one years, and should be supported for four months by the poll taxes and appropriations from the state treasury which together would be sufficient for that purpose, and thereafter, in event they should be maintained for a term longer than four months, by taxes levied by the county or school district.   Section 206 not only provides from what sources the revenue for the support of the schools shall be derived, but also to what portion of the terms of the schools the revenue from the different sources shall be applied.   The scheme provided therein for the support of the schools is complete, and, since nothing therein indicates a contrary intent, the provision therein therefore necessarily implies the exclusion of any other. *Expressio unius est exclusio alterius.*

One of the most elementary rules for the construction of a Constitution or statute is that, when it directs how a duty enjoined by it shall be discharged, is in effect a prohibition on the discharge of the duty in any other way. Cooley's Constitutional Limitations (7th Ed.), 98; *Field* v. *People,* 2 Scam. (3 Ill.) 79; 12 C. J. 750; *State* v. *Henry,* 87 Miss. 125, 40 So. 152, 5 L. R. A. (N. S.) 340; *State* v. *Barnes,* 24 Fla. 29, 3 So. 433; *State* v. *Patterson,* 181 Ind. 660, 105 N. E. 228; *State* v. *Stark County,* 14 N. D. 374, 103 N. W. 913; *Parks* v. *West,* 102 Tex. 11, 111 S. W. 726; *State* v. *Fountain,* 6 Pennewill (Del.) 520, 69 Atl. 926.

In *State* v. *Henry,* 87 Miss. at page 144, 40 So. at page 154 (5 L. R. A. [N. S.] 340), this court held: "That where the Constitution deals with a subject, its words must be the sole boundary and sacred from the legislatures, except where it permits expressly or by necessary implication; . . . that, where the Constitution schedules powers, giving or taking away, it must be presumed to have scheduled all, and it only must be looked to, with its necessary implications, for the limit of authority or restriction."

In 1912 the legislature enacted a statute which appears as chapter 5 in the laws of that session (section 1), providing:

"That there is hereby appropriated out of any money in the state treasury not otherwise appropriated, the sum of five thousand dollars ($5,000), or so much thereof as may be necessary, to be known as a supplemental common-school fund."

And that the money so appropriated should be distributed to the counties that might be unable to maintain their schools for four months out of their share of the regular common school fund. The second section of the statute here under consideration provides that the money appropriated for the support of the schools by that section shall be disbursed by the board of education in such manner as to equalize school terms and teachers' salaries throughout the state. Under this statute the board of education is necessarily empowered to aid any county in maintaining its schools for four months that might not be able to do so out of its share of the regular common school fund; consequently every objection that could have been urged to the validity of the statute of 1912 applies with equal force here. The Act of 1912 was construed by this court in *Board of Education* v. *Pridgen,* 106 Miss. 219, 63 So. 416, and was held to violate paragraph p of section 90 and sections 205 and 206 of the Constitution, which last section was held to measure the power of the legislature to appropriate money from the state treasury for the support of the common schools, and to prohibit it from appropriating any money from the state treasury for that purpose except such as should be appropriated as a part of and to be disbursed as the common school fund. But it is said that the court was not there called on to decide that question, for the reason that the appropriation there under consideration was made for the maintenance of the constitutional four-month term of the schools, and consequently all that was there said relative to the measure of the legislature's power to appropriate money from the state treasury for the support of the schools which should not be a part of the regular school fund was mere *dicta.*

Turning, then, again to the two statutes, it will be observed that the appropriation made in each is not from and is no part of the regular common school fund, but each is· a "supplemental" or "additional" appropriation "out of any money in the state treasury not otherwise appropriated" to be used for the purpose of equalizing school terms. One of the counsel for the board of education in the Pridgen case was former Chief Justice CAMPBELL, and it will not be doubted that he knew exactly what questions the court should decide in determining the validity of the appropriation. He assumed, as appears from his brief, that an appropriation from the state treasury to the common school fund is governed by section 206, but contended that after that appropriation has been made the legislature has the power to make an additional appropriation for the support of the schools out of any money in the state treasury not otherwise appropriated, and that the supplemental appropriation "is not from the state school fund, but from any money not otherwise appropriated." The power of the legislature, therefore, to appropriate money for the support of the schools which should not be a part of the regular common school fund was squarely presented to the court for decision, and it had not only the right, but it became its duty, to decide it. This it did, concluding its discussion thereof as follows:

"It thus appears to have been the purpose of the makers of the Constitution to provide for a uniform system of public schools for every county in the state for at least a term of four months in each scholastic year. This could have been done by requiring each county to provide funds to accomplish this purpose, but this was not done. The scheme adopted prescribes what shall be done by the state, and also prescribes the basis for the distribution of the state's contribution to this purpose, and this basis is necessarily exclusive, otherwise the legislature could ignore the plan of the Constitution and provide another and essentially different plan for the support of the common schools. Each educable child is the unit upon which the state dis-

tributes its bounty to the counties, and the legislature has no power to adopt another and different basis for state aid, which ignores the constitutional unit. A different scheme might have been provided by wiping out county lines and placing the common schools and their support entirely upon the state, but we are not permitted to change the Constitution because the legislative scheme may be more desirable, or may serve as a remedy for admitting evils not anticipated by the framers of the Constitution."

The holding in that case that the statute there under consideration violated section 205 of the Constitution because it permitted assistance to be given to counties that were unable to maintain their schools for four months out of the regular common school appropriation is also here in point, for, as I have hereinbefore pointed out, the appropriation here in question can and was intended to be so used if necessary. So, also, is the holding in that case that the statute violated paragraph p of section 90 of the Constitution, for the appropriation here, as was the appropriation there, is to be used, not for the benefit of all of the schools of the state, but for such only as may need assistance in lengthening their school terms in order that the school terms throughout the state may be equal. That case is controlling here, and should either be followed or overruled.

I do not mean to intimate by anything herein said that an appropriation to the common school fund which is insufficient or which is more than is necessary to support the schools for four months will be void. In the very nature of things it is impossible for the legislature to determine in advance the exact amount of money that will be necessary therefor; consequently, within probably certain limits, any appropriation, in so far as the amount thereof is concerned, that is made by the legislature to that fund will be valid. Before leaving this branch of the discussion, it may not be amiss to point out that the statute under consideration does not disclose, and this court cannot know, that the appropriation made in the first section

thereof is and was intended by the legislature to be sufficient for the maintenance of the schools for the first four months of their annual terms. Each section, in so far as making the appropriations is concerned, is couched in identical language, except where the first section provides:

"That the sum of two million one hundred fourteen thousand five hundred thirty-five dollars ($2,114,535) be, and the same is hereby appropriated," etc.

The second section provides: "That the additional sum of one million two hundred sixty-eight thousand seven hundred twenty-one dollars ($1,268,721) be, and the same is hereby appropriated," etc.

And the mere designation of an appropriation for the support of the schools as an "additional sum" therefore cannot change the nature thereof, for by whatever name designated it is for the support of the common schools. Here, as in the Pridgen case, "it seems," as was there said by Cook, J., "to be the theory that the legislature, by labeling the common school fund 'supplemental,' thereby changed the nature of the appropriation, and in so doing they provided a remedy for a condition entirely outside of the scheme marked out by the organic law."

The statute in so far as its validity and effect is concerned is the same as if it consisted of but one section appropriating three million three hundred eighty-three thousand two hundred fifty-six dollars "out of any money in the state treasury not otherwise appropriated for the maintenance of the public schools of the state of Mississippi for each of the calendar years 1922 and 1923," and then providing that one million two hundred sixty-eight thousand seven hundred and twenty-one dollars thereof be disbursed in the manner provided by section 2 of the statute as it now appears.

The public policy of a state must be determined from its Constitution and statutes, both past and present, and, if its public policy can be resorted to, as the majority of my Associates say it can, as an aid in construing a state's

Constitution, that policy must, of course, be determined as of the date when the Constitution being construed was adopted, and an examination of the Constitution of 1869 and of the statutes enacted thereafter and prior to the adoption of the present Constitution will disclose that the policy of this state then was to maintain its schools principally by means of local, with a minimum of state-wide, taxation, and to divide the money raised by state-wide taxation *"pro rata* among the children of school ages." Const. 1869, art. 8, section 10; Code 1871, sections 2051 and 2053; Code 1880, section 731, and sections 724, 730, as amended by chapter 42, Laws 1882, p. 77; Report of State Supt. of Education to Legislature, December 1, 1889, p. 27. Consequently the construction which the majority of my Associates have here placed on section 206 runs counter also to the state's public policy in the light of which that section was adopted.

It was said in *Ratliff* v. *Beale,* 74 Miss. 247, 20 So. 865, 34 L. R. A. 472, that:

"To find the true meaning of the language of the Constitution, we are to look to the existing body of the law, whether common or statutory, . . . to former Constitutions, . . . to existing evils, to the objects and purposes to be accomplished, and to the limits intended to be provided," for "it must be remembered that our Constitution was never submitted to the people. It was put in operation by the body which framed it, and therefore the question is what that body meant by the language used."

Article 8 of the Constitution of 1869, which deals with "school fund, education and science," provides by sections 1 and 5 thereof for a uniform system of free public schools to be maintained for at least four months in each year for the benefit of children between the ages of five and twenty-one years. Section 6 thereof provides for a common school fund to be made up of revenues derived from several sources, three of which were licenses for the sale of intoxicating liquor, fines, and forfeitures.

Section 10 thereof provides that: "The legislature shall from time to time, as may be necessary, provide for the levy and collection of such other taxes as may be required to properly support the system of free schools herein adopted. And all school funds shall be divided *pro rata* among the children of school age."

Section 724 of the Code of 1880, as amended by chapter 42, p. 77, Laws 1882, provides that—"Whenever the amount of school fund in the state treasury in any fiscal year, does not, in the aggregate, amount to three hundred thousand dollars, . . . the state treasurer shall transfer from the general fund to the common school fund a sufficient amount to make the sum of said school fund three hundred thousand dollars," etc.

By section 730 thereof, as amended by chapter 42, p. 77, Laws 1882, the boards of supervisors of each county were empowered to levy an annual tax of three mills "to make up any deficiency in the aggregate amount of common school funds arising from other sources, necessary to maintain the public free schools of said county during the time required by law."

And by section 731 a similar power was granted to the board of mayor and aldermen of any town constituting a separate school district. Under that Constitution and these statutes the revenue from which the public schools were supported was derived from four sources: First, licenses for the sale of intoxicating liquors and fines and forfeitures amounting annually to about two hundred thousand dollars (page 28 of the Report of the State Superintendent of Education, December 1, 1889); second, an annual appropriation from the state treasury of about one hundred thousand dollars (page 28 of the report of the State Superintendent of Education, December 1, 1889); third, an annual tax in each county of three mills for the support of the schools in the county; and, fourth, an annual tax from each separate school district for the support of the schools in the district.

In December, 1889, J. R. Preston, state superintendent of education, and to whose constructive work our present school system is largely due, in a report for the use of the legislature which convened in January, 1890, in which he went fully into the *status* and needs of the state's then system of public schools, and which report appears from its journal to have been before the constitutional convention when adopting the article of the present Constitution on education, said, among other things:

"The Constitution establishes a common school fund, and confers on the legislature power to provide additional revenues to maintain the schools four months. During the first years of our free schools a levy of four mills was made upon the whole property of the state, and distributed with the common school fund to the counties, in proportion to the educable children in each. This was found to impose excessive burdens of taxation upon the wealthier counties and towns, and the law was amended so as to allow them to retain their four-mill levy, which was subsequently reduced to two mills, provided therewith the schools could be maintained four months.

"The state at present distributes three hundred thousand dollars *pro rata* to the counties. About two-thirds of this arises from liquor licenses and fines and forfeitures, the constitutional sources of the common school fund; the remaining one hundred thousand dollars is transferred from the general state fund and is derived from direct taxation. Of this three hundred thousand dollars it is evident that the wealthier counties pay far more than is returned to them.

"The state distribution will not maintain the schools more than thirty days, or one-third of the term. The counties are therefore required to levy a tax sufficient to pay for the other two-thirds of the time, this levy being retained by each county for the support of its own schools. Thus, in a measure, the state seeks to equalize the burden of taxation for free schools, while at the same time she encourages and fosters a more liberal support of them by

taking advantage of the willingness of the people to build up home enterprises.

"If this county levy were collected by the state and distributed *pro rata,* the wealthier counties would be overburdened, and would make every effort to keep the levy as low as possible. It would, of course, inure to the benefit of the less wealthy counties, but would be unjust and inequitable towards those counties that now contribute most largely to the support of the state government.. The very principles that justify the retention of the three-mill levy in the counties led to the establishment of separate school districts, and apply *a fortiori* to them."

The report then proceeds to further demonstrate that the support of the schools by state-wide taxation results in an inequality of burdens and benefits to the various sections of the state, to the great dissatisfaction of the sections bearing the greater burden thereof.

When the constitutional convention met its members proposed in writing such changes as they thought should be made in the old Constitution and the form in which the sections dealing therewith in the new should be couched, all of which were referred to appropriate committees. A number of such proposals with reference to the article of the new Constitution on education were made and submitted to the committee on education, of which Gen. Stephen D. Lee was chairman, which committee on the fifteenth day of the convention's session reported an article on education as "a substitute for the proposed changes in the Constitution received to date." Convention Journal, p. 118. Sections 1 and 5 thereof brought forward sections 1 and 5 of article 8 of the Constitution of 1869 in practically the same form as they appear in the present Constitution. Section 6 thereof radically changed the then method of supporting the schools, and was as follows:

"There shall be a common-school fund, which shall consist of a poll tax of two dollars *per capita* on all males between the ages of twenty-one (21) and fifty-five (55) years; and of not less than four hundred thousand dollars per

annum from the general fund in the treasury.  Said funds shall be divided among the several counties and separate school districts of the state in proportion to the number of educable children in the same; and shall in each county be supplemented by such additional sums raised by county taxation on the property of the county, including separate school districts therein, as shall suffice, together with the distributive share of such county or district, to give each child in the county or district, four (4) months instruction in each year; the said supplemental fund being distributed as above among all the children of the county, including those of the separate school districts; provided, that any town, city, county or school district may levy additional taxes for school purposes; and provided that no such county levy shall be extended into any town, city or separate school district within the county making similar levies."

Section 11 reproduced section 10 of the Constitution of 1869, which authorized the legislature to supplement the school fund by taxation, but omitted the provision thereof requiring the school fund to be divided *pro rata* among the children of school ages, that requirement having been embodied in section 6 of the Report.  There was both a majority and a minority report by this committee.  The signatures to the minority report, which appears on page 131 of the journal of the convention, among which appear some of Mississippi's historic names, are those of W. T. Martin, R. G. Hudson, Edward Mayes, E. O. Sykes, Wm. D. Witherspoon, and W. C. Richards.  The principal objections raised by this minority to the proposed article were: First, that the amount of money sought to be distributed from the state treasury is too great, amounting, including the state tax, to about two-thirds of the then entire revenue of the state; second, there is much opposition to the free school system, and to burden the people with oppressive taxation therefor would work its destruction; third, the best interest of the schools and of the people, as appears from the report of the state superintendent of public ed-

ucation, *supra,* demands that the schools should be sup-
ported principally by local taxation; fourth, the plan pro-
posed by the majority is not a new one in this state it hav-
ing been tried, proven to be a failure, and abandoned. This
minority submitted also a substitute for the article pro-
posed by the committee which was not spread at large on
the convention's journal.

On the thirty-ninth day of the session (Convention Jour-
nal, p. 265) the committee reported that it had compro-
mised its differences, and reported a substitute for its
former proposed article on education, by which section 6
thereof was amended so as to provide that the common
school fund shall consist of the poll tax, "and of not more
nor less than four hundred thousand dollars per annum
from the general fund in the treasury." Mr. Jamison, of
the committee, dissented from this report, and offered as
a substitute therefor the article on education originally
proposed by the majority of the committee, section 6 of
which was as hereinbefore set out.

On the forty-seventh day the convention took up the
report of the committee on education, and considered it
for several days, during which numerous amendments
thereto and substitutes therefor were offered, which, in so
far as they affected section 6 thereof, may be classified as
follows: First, to confer upon the legislature unlimited
power in providing for the support of public schools both
as to the amount of money it could appropriate therefor
and the manner in which it should be distributed; second,
to limit this power by providing either the maximum
amount of money that could be appropriated from the state
treasury for the support of the schools or the length of the
term of the schools to the support of which money could
be appropriated from the state treasury; third, to pre-
scribe the method for the distribution of the money appro-
priated for the support of the schools from the state treas-
ury; fourth, to provide for prorating the money appro-
priated from the state treasury among the children of the

black and white races, or that each race should support its own schools by taxes levied on its own property.

During the progress of the debate:

"Mr. Robinson, of Rankin, was permitted to introduce the following substitute in lieu of substitute heretofore offered by him for section 6 of the substitute of Mr. Jamison:

"There shall be a common school fund, which shall consist of the poll tax (to be retained in the counties where same is collected) and an additional sum from the general fund in the state treasury, sufficient to maintain the common schools for the term of four months in each scholastic year.    Said sum shall be distributed among the several counties in the state, in proportion to the educable children in each.    But any county or separate school district may levy further tax to maintain its schools for a longer time than the term of four months."

Which was amended on the motion of Mr. Dillard by adding thereto the following:

"The common school fund shall be distributed among the several counties and separate school districts in proportion to the number of educable children and youth in each, from *data* to be collected through the office of the state superintendent of education in the manner to be prescribed by law."

The Robinson substitute, with the Dillard amendment thereto, "was then adopted in lieu of section 6 of the substitute of Mr. Jamison for the committee's report."    Convention Journal, p. 355.

Section 10 of the Jamison substitute, which read as follows: "The legislature shall, from time to time as may be necessary, provide for the levy and collection of such other taxes as may be required to properly support the system of free schools herein adopted," was then stricken out, and, after voting down a few other amendments thereto, among which was one conferring unlimited power on the legis-

lature to appropriate money from the state treasury for
the support of the public schools, the convention adopted
the Jamison substitute as amended as the article on ed-
ucation for the new Constitution. In due course the ar-
ticle was submitted to the committee on revision, which
changed the verbiage of section 6 to the form in which it
appears in the final draft of the Constitution, and it so
remained until amended in 1904, so that the counties should
not be charged with the poll tax collected therein in the
distribution to them of the school fund.

But it is said that, when section 206 is construed in con-
nection with sections 201 and 205, it will appear that sec-
tion 206 does not limit the power of the legislature to ap-
propriate money for the support of the public schools.
Such was not the opinion of the members either of the con-
vention which adopted the Constitution of 1869 or of the
convention which adopted the present Constitution. As
hereinbefore pointed out, sections 201 and 205 of the pres-
ent Constitution are in substance the same as sections 1
and 5 of article 8 of the Constitution of 1869; neverthe-
less section 10 of article 8 of the Constitution of 1869 and
section 11 of the report made by the committee on educa-
tion to the convention which adopted the present Consti-
tution authorized the legislature to support the public
schools without limit either as to the amount of money to
be expended therefor or the length of the school terms.
But, when the Convention adopted section 206 of the pres-
ent Constitution, making it obligatory on the legislature
to support the schools for four months, it struck out the
section in the committee's report which would have given
the legislature the power to support them for longer terms,
thereby indicating that it did not intend to invest the legis-
lature with that power. This construction of its powers
to appropriate money for the support of the public schools
has been uniformly acted on by the legislature since 1892,
a period of more than thirty years, save only when it
enacted chapter 5, Laws of 1912. Its journals will dis-
close that numerous attempts were made to submit to the

people an amendment to section 206 of the Constitution which would relieve the legislature of the limitations on its power therein contained, particularly the limitation on the length of the term for the support of which it could appropriate money from the treasury, but always without success.

The department of education has also construed section 206 to be the measure of the legislature's power to appropriate money out of the state treasury for the support of the public schools. In his report to the legislature of 1914 the then state superintendent of public education recommended that a constitutional convention be called "to provide for a just and equitable distribution of the common school funds . . . which can only be brought about by amendments to the Constitution or through the holding of a constitutional convention." And the present state superintendent of public education, in his report to the legislature of 1918, stated that "the Constitution should be so changed as to allow the state department of education to divert state school funds not needed in some counties into those counties where there is always a deficit," and, in order that the Constitution might be so amended, he, on August 4, 1919, filed with the secretary of state, as will appear from the records of his office, the petitions for the submission to the people of the amendment to section 206, under which the statute here in question was enacted.

Judge ANDERSON requests me to say that he concurs in the construction I have herein placed on section 206 of the Constitution and in the reasons given therefor.